Catron, Ch. J.
The first ground for relief alleged in the bill, is, that the deed from Caroline P. Taul and her husband to Benjamin Deckard, was procured to be acknowledged by fraud and combination between Thomas P. Taul, and the defendant, N. W. Williams, Esq. judge of the third circuit.
Judge Williams took the privy examination of Mrs *549 Taul at the house of Mr Campbell, some 150 yards from the court house, having left the bench a short time for that purpose. . He, at the same time, took her acknowledgment to a deed made by herself and husband to Porter, for part of the same lot. As to the legality of this mode of taking the examination, in reference to the Porter deed, Mr Campbell concurred with Judge Williams. It had been his practice in other cases; and this court have no doubt Judge Williams acted in the best faith, and without the remotest suspicion that he was acting illegally, or in any manner contrary to his plain duty. That T. P. Taul was guilty of a fraud upon the court in having taken the acknowledgment, we think almost impossible. The act was personal on the part of the judge, and in which Taul had no concern, save to require he would examine his wife, and take her acknowledgment to both the Porter and Deckard deeds at the same time. In doing the business, Judge Williams acted upon his own judgment and experience, uninfluenced in this respect. by Mr Taul.
Whether the record of the privy examination of Mrs Taul is, for irregularity, voidable, a court of chancery has no power or jurisdiction to enquire. To do so, would be assuming the power of a court of error; and every order and judgment at law, might be assailed by the court of chancery, and upturned by parol proof. This power is not claimed by the bill, or the argument, (and its existence was denied by the chancellor;) but it is alleged, that the record was made, not in mistake, but by a fraudulent combination between the presiding judge and T. P. Taul, to cheat Mrs Taul and her heirs, or expectant brother and sister. A judgment at law may be impeached in equity for fraud. Shatterkirk vs. Wheeler, 3 John. Ch. C. 278. Yet there having been no fraud, and two members of the court thinking it probable no mistake in making the record, even had a *550 court of chancery power to enquire into it, this ground „ ,. ,11 oí relief is untenable.
It is next alleged in the bill, that Thomas P. Taul, by fraud and contrivance, imposed upon bis wife, and caused her to convey the balance of the lot, (not sold to Porter,) to Benjamin Deckard, who immediately, without any consideration, reconveyed to Taul and wife jointly. The original bill was filed against Thos. P. Taul, who died before he answered, and the cause was revived against his devisees. This part must, therefore, be examined, as if he were before the court.— Thomas P. Taul took as a volunteer; and the complainants, as heirs of Mrs Taul, claim as volunteers. They charge the husband with having committed a fraud upon his wife, which it lies upon them to prove. There is a remarkable agreement between the evidence of the witnesses on both sides, and of the history of the parties concerned; and of this particular transaction, the proofs taken in connection with the pleadings, are entirely satisfactoiy. The following is the result of the pleadings and evidence upon the minds of the three judges who take part in the decision of this cause, and in which result they concur in every particular.
The lot in question had been given to Miss Anderson by Mr Tate, whose wife was a relation; for which reason Mrs Taul felt herself under less of obligation to bestow it on her own family, than if it had been derived from that source, and so expressed herself; an important circumstance, when we are enquiring what her deliberate and settled intention was; and whether that intention was executed by the deed from herself .and husband to Deckard, and the reconveyance by him to them jointly. A consideration of considerable weight with the court, was not adverted to in the argument, and which we think strongly tends to prove that the making of the deed was done pretty much of her own accord. William P. Anderson had been twice *551 married, and had three children by a first wife, of whom Caroline was the youngest, and five by a second wife. Mrs Taul did not intend her brothers and sisters of the half blood, should have her property after her death, by donation or inheritance. When she made the deed to Deckard, she strongly anticipated she might die, and soon, from her then illness. A will she could not make; and if she died without divesting the title to the lot, it would descend to her seven brothers and sisters equally, to the exclusion of her husband, and to a great extent, of her sister, Mrs Campbell, obviously, the next object of her affection and care, as also of her brother Rufus. That she desired to avoid this contingency, is certain from the proof; and it is equally certain, that she executed the deed to Deckard, with a settled purpose to provide, to some extent, for the first objects of her affection, and in obedience to what she deemed her duty. The transaction so far, stands not directly impeached by the complainants; but the charge in the bill is, that Thomas P. Taul, the husband, undertook to execute his wife’s intentions, in doing of which he grossly imposed upon and deceived her, by causing the property to be bestowed wholly upon himself, to the exclusion of her brother and sister of the whole blood; whereas her design was only to furnish him the reasonable means of support out of the estate, during his lifetime, by its use, not destruction; or if he wére to sell, it was designed no more should be sold than his wants reasonably required, and what remained unexhausted at his death, should then be the property of Mrs Campbell, or Mrs Campbell and Rufus K. Anderson, jointly.,
Did Taul impose upon his wife as alleged? To ascertain this, his and her condition must be looked to;, as also their characters and standing. They intermarried in the spring of 1827. Thomas P. Taul was then twenty-four years of age, by profession a lawyer, and practising. As a man of acquirements in his profession,. *552 and otherwise, and as a man of decided talent, energy an industry, he stood high. His character and bearing in society, seems to have accorded well with his talents and acquirements. Such was his character when he married, and such it continued until after the deeds in controversy were executed. He commanded the ardent affection of his young wife, (little over twenty-one when she died,) and the esteem and friendship of her relations. Mrs Taul’s character is given by Dr Dixon. He says, “her mental powers were naturally of the highest order; her mind was well stocked with acquired knowledge; she possessed firmness in a high degree, and her general character was remarkable for promptness and decision; and she generally expressed her views and opinions with independence, and without hesitancy.” He further, proves, that at the time, and before and after the deeds were executed, her mind was unaffected; she being afflicted by no particular disease, but debilitated by reason of pregnancy. Doctor Dixon was her physician and saw her daily, and often several times in a day. A letter of her’s to her husband at Huntsville, after the deeds were executed, also shows her mind to have retained its vigor, ardor, and affectionate attachment to him. Another letter of her’s, of 1827, to Mr. Taul, then at Nashville, shows her to have been a most prudent and able adviser in family arrangements; that she understood the situation of her property perfectly, and advised its sale in part, and the application of the proceeds, with a judgment and discretion very uncommon for one of her age and sex. Her letters show, and- the proof shows, that there were no half-formed purposes, or puny misgivings in her conduct. Indeed she manifested much more capacity and prudence in the management and disposition of the property, than Mr. Taul did. In such matters, he was obviously an inexperienced man, and of expensive habits. She was any thing but a feeble-minded, negative *553 woman, dependent on the mind and will of her husband; had full confidence in her own judgment to do her own business, and abundant determination to do it in her own way. Such was this young couple. Presently after their intermarriage, his health began to decline. The symptoms were obviously consumptive. In the winter of 1827-8, they went to the lower Mississippi, for the benefit of his health, and returned in the spring of 1828. Shortly after, they removed to Huntsville, where he designed pursuing his profession. He found himself unable, and his health getting worse. She was in a state of pregnancy, by reason of which she sickened very much, and became greatly enfeebled. Her sister, Mrs. Campbell, wrote her most affectionately, insisting she should return to Winchester, stay with her, and be nursed by her. Mr. and Mrs. Taul returned to Winchester, and resided in the house of Mr. Campbell; Mrs. Taul being confined to her room and bed, her health declining, until she herself thought the chances against her living over the delivery of her child. This was in July and August, 1828. She did not apprehend her husband could live long, but that by spending his winters in the south, he might prolong his life. Under these melancholy circumstances, she set about arranging her worldly affairs. She felt it to be her first duty to provide for the remaining days of her unfortunate young husband, who might linger out a melancholy existence for years to come. Her reasons for doing so, and for the provision she did make, will best appear from the statements of Benjamin Deckard and Doctor Dixon. Dixon was the trustee, is entitled to every credit, and is the witness of complainants. After Mr. Campbell had objected to the deeds, and conversed with Mr. Deckard, he at the request of Mr. Taul, called on Mrs. Taul, to converse with her on the subject; Taul having declared most solemnly, and rather imploringly to Deckard, that the business was *554 done in perfect accordance with Caroline’s wishes, and pursuant to a determination formed at Huntsville.—Deckard went and saw her. She said, “the reason why she had made the conveyance, was, that Mr. Taul was in such ill health he could not make his living by his profession, and she felt it her duty to provide for him, as she was enabled to do so; and that she could not think of placing the property in the hands of another person, to allow Mr. Taul so much money yearly. She could not lessen him so much as to have him on an allowance.” Mr. Deckard then intimated so that she understood him, whether, if Mr. Taul married again, she wished him to have the property. She replied, “I don’t care if he marries fifty times.”
She remarked to Mr. Deckard, that Mr. Taul had made a will, placing her in the same situation she was before, should he die first. Deckard then asked her, should she and Taul both die, did she intend the property should go to his family? She replied, by no means. In that event, she wished her sister, Mrs. Campbell, and her brother Rufus, to have it. Mr. Taul then came in, and ascertaining the wishes she had expressed, remarked, they had not looked beyond themselves in the will then in his wife’s possession, but for Mr. Deckard to sit, and he would write one devising as she desired. This he did, devising the property first to his wife, then to their issue; then, that what should remain undisposed of at his death, or the proceeds remaining, should go to Mrs. Campbell and Rufus K. Anderson. He handed the will to Deckard for safe keeping, and promised to call the next day and have it witnessed, and take a copy. This he failed to do; but that day, (29th July, 1828,) he wrote a more formal one, all in his own hand and signed by himself, took duplicates, and deposited the original with his then devoted friend, Mrs. Campbell. This gave the pro *555 perty the same direction as the one deposited with Deckard.
Doctor Dixon also, had a conversation with Mrs. Taul, which he gives in her own words: “You know Doctor, (said she,) that I am in a very delicate situation. I may live to give birth to my babe, or I may not. I know the prospect is against me, although you try to encourage me. Mr. Taul’s health you know, is precarious also. Should my unborn babe and myself, or either of us survive him, I wish the property to be ours; but should he survive us, I wish him to have the full benefit of all the property that was once called mine, during his lifetime; for who can be dearer to me than he? I know that his constitution is such, that he cannot pursue the practice of law for a livelihood, and I wish him to live independent. A change of climate might be of service to him; and you know Doctor, a man cannot travel without money. For these reasons, I wished the deed which I have executed to be made.” Doctor Dixon then made the inquiry Mr. Deckard had, how she wanted the property to go, if she, the expected infant, and Mr. Taul, should die. She replied in substance, that what was left of it, she wished Mrs. Campbell and her children to have.
Mr. Hekerson states, that in September, 1829, after Thomas P. Taul’s death, Mr. Campbell conversed with him on the subject. He asked Mr. Campbell if Caroline Taul was willing the property should be put in her husband’s hands in the way it was? Mr. Campbell replied, she was. He had went and talked with her, and told her she had better make a deed to some other person. She said the principal part of her property was that lot in Nashville, and it would be of no benefit to Mr. Taul, without it was put into his hands so that he could dispose of it; for he was not able to get his living by his practice; and that no other way would satisfy her, but the way it was done. That she *556 wished to see her father, and when he came it was about to the same amount.
Fletcher and others prove the lot to have been vacant and unproductive.
The facts stated by Mr. Campbell to Mr. Hekerson, we think proved beyond doubt, that Mrs. Taul acted upon her own judgment, and in accordance with what she believed to be her duty, and consistent with her own honor, and that of her husband, we are satisfied; nor do we believe her husband practised any fraud or deception upon her. She knew the effect of the deeds, and of the will made at ihe time, just as well as Taul did. They both believed that the joint estate vested in the husband and wife, by Deckard’s deed to them, was an estate that would survive to the longest liver on common law principles. 2 Kent’s Commentaries, 112. She also knew the will could be revoked; she so replied to Mr. Deckard when he asked her the question, and added, that if she could not trust the honor of her husband, who could she trust.
Thus matters stood on the 23d July, 1828, when the deeds were executed. If at that time, the deeds were fair, and according to the intention of Mrs. Taul, and we think they were, then no after conduct of Mr. Taul could make them fraudulent.
Mr. Taul having on the 23d of July, a vested right, on the 29th he made the wills deposited with Mr. Deckard and Mrs. Campbell. These were made to satisfy friends, willingly and fairly. On the 16th of August, Mrs. Taul was delivered of her child, stillborn, and on the last day of the month she died.
In the original bill filed against Thomas P. Taul, these wills were sought to be set up as constituting part of the original contract, and attempted to be enforced as agreements against Taul, by virtue of which the bill attempted to restrain him from disposing of the property. Had the wills been incorporated in the deed *557 from Deckard to Taul and wife, Taul, as the first taker, could have absolutely sold and exhausted tbe whole property. To an interest so uncertain as to depend upon the will and pleasure of the first taker, the law affords no protection. So this court decided in Smith T. vs. Bell and wife, at Knoxville, 1827;(a) and in David’s heirs vs. Bridgman, Knoxville, 1829.(b)
The amendment to the bill sets forth some supplemental matter, and a new ground for relief against the devisees of Thomas P. Taul. It alleges, “that it was the wish and intention of said Caroline deceased, when the deed in the original bill mentioned, was made to Deckard, to give said property to said Thomas P. Taul during life, and for him to have the use of it, for his support as long as he lived; and in the event he died without issue, thén, that the same should go to her sister, Musadora, and her heirs, or to said Musadora and Rufus, and their heirs. That the said Thomas promised to make such provisions by will or otherwise, as would effectuate this intention on the part of said Caroline; and that this was the condition and means by which he procured the deed aforesaid to Deckard to be signed by said Caroline; and he executed various wills, alleging it to be his purpose in making them, to carry the wishes and intention of his wife into execution.”
The wills executed are then referred to and described. The allegation is, that Thpmas P. Taul was to take an estate for life, remainder to M. B. Campbell, and her heirs; or to said Musadora and Rufus and their, heirs. The statute of frauds is pleaded to this supplement; but admitting parol evidence to be competent, the proof of complainants shows the allegation to be wholly untrue. Thomas P. Taul had the absolute right of disposition of the property by sale. The mere use *558 would have been worthless, and therefore Mrs. Taul refused in the most positive terms to limit her husband to the use for life.
As the arguments however were most earnestly pressed, on various points supposed to arise on this part of the record, it is but just to notice them, although in truth, we think this amendment a mere experiment, not noticed by the chancellor, no doubt for the reason that there was no proof, parol or written, to sustain it.
Did Thomas P. Taul, on the 29th of July, make such promise? To this allegation the Statute of frauds is pleaded by defendants, alleging there was no promise or agreement in writing. For complainants it is insisted, that Taul held as trustee, and to prove the trust no writing is required. Taul held the legal title. Complainants say, he undertook and agreed that at his death Musadora Campbell and Rufus JK. Anderson, should take the estate in remainder, and this agreement is now set up, viz: that for and in consideration his wife had vested in him lot No. 89, in Nashville, for and during his natural life, Thomas P. Taul agreed and bound himself, so to provide, by will or otherwise, that it should at his death vest in Musadora B. Campbell and Rufus K. Anderson.
This court has come to the determination some years since to execute the statute of frauds as nearly within the letter as may be. That such a contract as is alleged, is, for the sale of lands, within the meaning of the act of 1801, c. 25, there can be no doubt. Every man promising to convey lands might with equal claims be treated as a trustee. The parol proof to establish the contract was inadmissible. M’Clure vs. Patton, Nashville 1828.(a) Newnan vs. Carroll and Hayes, Nashville, 1832.(b)
*559 But it is insisted, the letter of Taul to James Campbell of 19th September 1828, proves the agreement in favor of Musadora and Rufus, as set forth in the supplemental bill.
This letter cannot be helped by parol. It was addressed to a third person; was a proposition to buy his peace; describes no property; states no consideration but the wife’s wishes: it is in fact an offer to sell 87 feet of some lot, situated some where, to Mrs. Campbell and Rufus K. Anderson, for a thousand dollars. Were this letter placed in the hands of a stranger to these parties and this transaction, it would be incomprehensible. Nor does it refer to any will, or paper by which it can be explained. The letter does not admit that Thomas P. Taul was only to have an estate for life in the premises. To hind him by this letter as an agreement, would be a gross perversion. For this court specifically - to decree against the devisees of Thomas P. Taul, would be impossible, as to Rufus K. Anderson, on other grounds. Taul did not revoke his will, nor is there any evidence he intended it, until very shortly before his death. The controversy produced by this cause brought Anderson to Tennessee, where he shot Taul in 1829, giving him a mortal wound, of which he some days after died. Two days before his death, some one asked him if he had arranged his worldly matters. He replied he had made a will, but the man who shot him was a principal legatee, and it must be altered; which he did. A reason for revoking, more imposing, could hardly be thought of; certainly in the melancholy history of last wills, one has not been found more forcible.
Mrs Taul did not intend, under any circumstances, the will should not be revoked. Suppose by litigation Thomas P. Taul had been kept from the use of this property five years, during which time he had become indebted for maintenance to its value: If he had then died, and left a will devising it to pay debts, it would have been *560 well, had he agreed as is alleged. Or both the devisees might have died before him. Thomas P. Taul never was bound by contract with Mrs. Campbell and Rufus K. Anderson, not to revoke. His wife trusted to his honor, which we think was not violated by altering his will under the circumstances. Had a written contract existed, as alleged in the supplemental bill, we think it could not have been specifically executed, because it would have been most unreasonable to do so. 1 Mad. Ch. 405, Francis’ Max. 5.
The character of Micah Taul, the devisee, has been assailed on the argument, for having combined with his son to commit the alleged fraud. There is no such charge in the bill or supplement, nor is there the slightest proof that he concurred in the matter. He has also been charged with mis-statements in his answer. The court are not aware that he has mis-stated in any material matter. Had he produced the wills that he was required to produce, and no fair exception exists to the answer as it comes to this court. He says he thought they were copies of that in the hands of Deckard, and destroyed them as useless. If they were destroyed before the supplemental bill was filed, 12th February 1830, then no reason exists for any complaint; yet this is left uncertain from the answer. Thai they were copies of the will in the hands of Mrs. Campbell, the court has little doubt, and could have had no effect had they been produced. For this neglect and the following reason, however, the court will not give costs. Thomas P. Taul, his wife, complainant’s and defendant’s counsel, have been mistaken as to the effect of the deed from Deckard to Taul and wife jointly. By an ancient technical rule of the common law, the husband and wife being deemed by it one person, took an entire estate, and if one died the whole estate continued in the survivor. Co. Litt. 187, b. “This is a nice distinction, laid down in the old books, *561 and it continues to this day to be the law,” says Chancellor Kent. 2 Kent’s Com. 112.
Such a distinction applied in practice in Tennessee, would strike the learned and unlearned, we imagine, with something like wonder. The statute of descents of 1784, ch. 23, sec. 2, repeals the rule: It provides, “that when any person shall die seized or possessed of, or having any right, title or interest in and to any estate, or inheritance of land, or other real estate in fee simple, and such person shall die intestate, his or her estate, or inheritance, shall descend”—to his children, &c. Every word in the recited clause must have its effect. The object of the legislature was to promote the equality of property, by causing the estates of persons dying intestate, to undergo a more general distribution. Every estate, and every interest in lands, whether, at the time the act was passed, they were or were not of inheritance, if they were of a fee simple character, descended by force of the act.
Furthermore: It has often been determined, that our deeds for lands are not common law conveyances, but rest mainly for their validity on the act of 1715, ch. 38, sec. 6, which intended to simplify conveyancing, so as to be understood by a plain and unlearned people, who endorsed their patents, and who were both ignorant and regardless of the tedious and technical forms of the English conveyances. The deed was to be good and available in law, in what manner or form soever drawn, and pass the estate as its face purported, when registered, without livery of seizin, attornment, or other ceremony in the law. Technical niceties resting in the depths of the feudal history, only to be learned from books printed in a language not understood, were certainly intended to be cut off by the'act of 1715; and we imagine this, of the entire estate continuing in the husband or wife, among the number. The husband and wife owned a tract of land jointly, by deed executed *562 after coverture, and the husband dies leaving children; could the community be pursuaded the wife took the land from the children, contrary to the plain wojds of the deed? We think not. The court could not hope to have confidence accorded to such a decision by the legal profession, and much less by those who take their titles to be what their deeds say they are. We think on Mrs.Taul’s death'.her moiety of interest in the lot in controversy, descendedlo her seven heirs,the complainants.
They have been claiming the moiety of Micah Taul and daughter, and the latter the moiety of complainants. Therefore, the parties will pay their own costs, save Deckard and Williams, whose costs complainants, Campbell and Rufus K. Anderson, will pay. No execution will issue against the infant complainants, but against their next friend, who shall be entitled to receive it from said minors.
Main stress in the argument has been laid upon the fact that Taul attempted to have the deed executed to Deckard in a private manner, without communication with Mrs. Taul’s relations. This is certainly true. Rut it is very probable that she desired the same thing.— Her nearest and dearest relations were by her daily and hourly, yet she never mentioned the subject to them, foreseeing, no doubt, it would produce more or less of excitement. That she was restrained from doing so, by reason of any fears of her husband operating on her mind, is next to ridiculous; nor has any one in argument so assumed. If any thing is proved by this record beyond dispute, it is, that so far as will is concerned, and the expression thereof, Mrs. Taul feared nobody. The manner of doing the thing, is well calculated tó draw off the court from the true question, of what Mrs. Taul did do; and whether it was done of her free will and pleasure. If so, the manner is an immaterial circumstance. The property was her own, nor had any one a right to call in question.§ie donation to her husband, if accord *563 ing to her wishes. Her relations had no more right to say to her she did wrong, than William Tate’s had to say to him, when he gave her the loi; and so she in substance expressed herself when it was desired the deed should be cancelled.
Much stress has also been laid on the proof that Thomas P. Taul’s character was bad. What little of proof there is of the kind appearing in the record, was mainly produced by this controversy; is worth nothing in itself, and if ever so strong, could prove no fact. This evidence we deem incompetent, and regret to find it in the record.
There is another piece of evidence we equally regret was introduced by the defendants. It is the letter of Mrs. Campbell to Thomas P. Taul, of the 11th July 1829. Mrs. Campbell had stood by Mr. Taul with a woman’s “truth and faith,” as she tells him, when few else did. He neglected her; and as she believed, the memory of her departed sister, his late wife. He neglected to visit Mrs. Campbell after his retard from Florida, and sent for the furniture remaining at her house; his by law truly, but hers by courtesy and anticipation. It also seems, he excused himself for the neglect of not calling, that she ought to have called on him first; and asserted he had heen kind to herself and children, after having taken every article of value from her possession. Her feelings were aroused most naturally at what she supposed most unkind and ungrateful treament; and she wrote him a note resenting it, in which she expressed herself hastily, and with something more of temper and harshness than in a cooler moment she would have done. This note was set out in the answer; stricken out by the chancellor, but again put in the record by proof, and we think most unjustifiahly. It does not mention the lot in controversy, proves nothing, and is pretty much of a piece with a deposition proving Thomas P. Taul’s general character bad; each making a court of *564 chancery a register for detraction, one violating female delicacy, the other the sanctity of the grave! We had thought to have passed these matters over, by reason of the intelligence and high standing of the parties, but on reflection, this was found the best reason for marking with our decided disappiobation such evidence. Not to have done so, would have been shrinking from a duty due to the country, and to the decent administration of justice. It may be remarked without any particular reference to this cause or the parties thereto, if the courts of chancery so far forget their duty, or shrink from it, as to permit every irrelevant slander, or truth if you please, to be proved, and harrow up every misdeed of a man’s life, who comes, or is brought into the courts, not permitting the dead to escape, or the wife, the passions of parties seeking gratification will soon make them the sinks of registered infamy, and their records a black-book and nuisance. From such tribunals every man, and especially every woman, who has erred, and few have not, will shrink with horror, and most justly. Justice herself will be driven out of them, and none apply for relief but such as are above and beneath detraction. It must not be. The pruning hand of the master must be set to work below, or in this court. Below it should be done, and the authority of the court exercised to suppress such libelous matter, so that it might not go down to future ages, wantonly to disgrace the party and his descendants. Furthermore; our records present piles of impertinent matter taking up much of the time of the court in the mere reading, and when read, so confused and overwhelming, that generally not the least difficulty is, to find what is pertinent, and greatly obscuring it when found, The bill will be dismissed.

 Martin and Yerger’s Rep. 302.

 2 Yerger’s Rep. 537.

 Martin and Yerger’s Rep. 333

 Ante, page 18.